**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                              |     |                              |
|------------------------------|-----|------------------------------|
| **PROFILES, INC.,** *et al.*, | *   |                              |
|                              | *   |                              |
|                              | *   |                              |
| **Plaintiffs,**              | *   |                              |
|                              | *   |                              |
| **v.**                       | *   | **Civil Case No.: SAG-20-0894** |
|                              | *   |                              |
| **BANK OF AMERICA CORP.,** *et al.*, | * |                      |
|                              | *   |                              |
|                              | *   |                              |
| **Defendants.**              | *   |                              |
|                              | *   |                              |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### MEMORANDUM OPINION

Profiles, Inc. filed a Second Amended Complaint on behalf of a putative class ("Plaintiffs") against Bank of America Corporation and Bank of America, N.A., (collectively, "BofA"). ECF 5. Plaintiffs now move for a Temporary Restraining Order and Preliminary Injunction, seeking to temporarily, and preliminarily, enjoin BofA from imposing restrictions on borrowing under the Payroll Protection Program ("PPP"). ECF 7. BofA filed an opposition, ECF 15, and a telephonic hearing was held on April 10, 2020. For the reasons explained below, Plaintiffs' Motion will be DENIED.

## I.    FACTUAL BACKGROUND

The novel coronavirus ("COVID-19") pandemic has caused unprecedented disruptions to the way of life for the American people. In particular, many small businesses across the country have been effectively shuttered for nearly one month, with no apparent end in sight. In response to the crisis, the federal government enacted emergency legislation, with the goal of affording some relief to American small businesses. Congress passed, and on March 27, 2020, President Trump signed, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), P.L. 116-

136; ECF 7-8, "to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic," Interim Final Rule, 13 C.F.R. Part 120, ECF 7-2.

Under the CARES Act, the Administrator of the Small Business Administration (the "Administrator") has the authority "to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID-19 emergency." *Id.* at 3. Section 1102 of the CARES Act amended the Small Business Act ("SBA"), 15 U.S.C. § 636, and established the $349 billion PPP, under which participating lenders are authorized to make loans to eligible small businesses. *See* P.L. No. 11-136, § 1102(a)(2).

BofA began accepting online applications for PPP loans on April 3, 2020. ECF 15 at 6. At that time, BofA only permitted applications from customers with a preexisting borrowing relationship with BofA. Plaintiffs Elite Security Group ("Elite") and Proline Products, Inc., ("Proline") attempted to submit applications on this date. Elite provides security services to bars and other non-essential businesses in Maryland. ECF 7-4 ¶ 2. However, as a result of Governor Hogan's recent orders, most of Elite's clients have temporarily closed, causing Elite to lose significant revenue. *Id.* ¶ 4. Proline is a Connecticut-based sole proprietorship, which sells automotive roof racks and related accessories. ECF 7-5 ¶ 2. Proline has also experienced a dramatic decrease in monthly revenue as a result of COVID-19 and the related governmental orders. *Id.* ¶ 4.

Proline has been a banking customer with BofA for the past 25 years. *Id.* ¶ 7. On April 3, 2020, Proline's owner contacted BofA about submitting an application for a PPP loan, but BofA would not accept Proline's application, because the company had no borrowing relationship with BofA. *Id.* ¶ 8. A branch manager advised Proline to "'go someplace else' so that [it] didn't miss

out on the PPP loan program." *Id.* ¶ 9. Elite had a similar experience when its owner attempted to apply for a PPP loan through BofA on April 3, 2020. Although Elite, similarly, has a longstanding deposit relationship with BofA, BofA would not accept the company's application, because it had no borrowing relationship with the bank. ECF 7-4 ¶ 8.

Thus, because of BofA's policy, Proline and Elite were unable to successfully apply for a PPP loan on April 3, 2020. Subsequently, however, the respective owners of Proline and Elite learned that BofA had made substantive changes to its PPP loan application requirements. *Id.* ¶ 9, ECF 7-5 ¶ 10. Namely, on April 4, 2020, BofA revised its policy to allow *depository*-only clients to apply for PPP loans as well. *See* ECF 7-6. However, under the new policy, businesses maintaining only a depository relationship with BofA can apply for a PPP loan only if they do not have a credit or borrowing relationship with another bank:

> To be eligible, you must have a Small Business lending and Small Business checking relationship with Bank of America as of February 15, 2020 *or* a Small Business checking account opened no later than February 15, 2020 and *do not have a business credit or borrowing relationship with another bank.*

*Id.* at 2 (second emphasis added).

On April 6, 2020, BofA told Proline that because it has credit cards with Chase and American Express, it should apply for a loan through one of those entities, but not BofA. ECF 7-5 ¶ 11. Also on April 6, 2020, Elite's owner, Brandon Burr, completed an application on BofA's website. ECF 7-4 ¶ 9. Elite has a lending relationship with another bank that its owner believes is not "an SBA lender." *Id.* Accordingly, Burr "checked that Elite did not have a lending relationship at another bank." *Id.* Even so, he remains "greatly concerned that [BofA] will reject Elite's PPP loan application based on Elite's other lending relationship." *Id.* ¶ 10.

Plaintiffs contend that other class members have had difficulty applying for PPP loans with BofA. Plaintiff Diaspora Salon, LLC ("Diaspora") is a hair salon, and Plaintiff Profiles, Inc.,

("Profiles") is a public relations firm — each located in Baltimore, Maryland. ECF 5 ¶¶ 17, 19. On April 4, 2020, the founder and owner of Diaspora successfully applied for a PPP loan from BofA. *Id.* ¶ 61. However, she was not asked to indicate whether Diaspora had a borrowing relationship with another financial institution. *Id.* She attempted to alter her application the following day, but was prevented from doing so when she attested that Diaspora indeed had a borrowing relationship with another financial institution. *Id.* ¶¶ 62, 104. Similarly, the owner of Profiles tried to apply for a loan under the original BofA restrictions, which were in effect on April 3, 2020. *Id.* ¶ 44. Profiles is a banking client of BofA's, but does not have a borrowing relationship with the bank. *Id.* ¶¶ 41, 42. Profiles has not attempted to apply since BofA changed its policy to allow applications from entities with only a depository relationship. Instead, its owner applied for the PPP through a different institution, but had not yet received a loan number as of April 10, 2020. Hrg. Tr. at 26:23–27:6

Plaintiffs filed their original Complaint on April 3, 2020, ECF 1, and filed an Amended Complaint the next day, ECF 3. Following BofA's policy change on April 4, 2020, Plaintiffs filed the operative Second Amended Complaint on April 7, 2020. ECF 5.

## II. LEGAL STANDARD

A temporary restraining order ("TRO") or a preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Wilson v. Williams*, 2019 WL

4942102, at *1 (D.S.C. Oct. 8, 2019).  The movant must establish all four elements in order to prevail.  *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

A temporary restraining order, much like a preliminary injunction, affords "'an extraordinary and drastic remedy' prior to trial."  *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances.") (citation omitted).  Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are particularly disfavored.  *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019).  Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear."  *Id.*

## III.   ANALYSIS

### A.  Likelihood of Success on the Merits

To obtain preliminary injunctive relief, Plaintiffs bear the burden to show that they are likely to succeed on one of their claims.  *See, e.g.*, *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 527 (W.D. Va. 2018).  Here, Plaintiffs contend that BofA's "unlawful gating requirements interfere with and prevent Plaintiffs from exercising their statutory right to apply for PPP loans under Section 1102 of the CARES Act."  ECF 7-1 at 14.

#### 1.  Statutory Background

The CARES Act authorizes participating lenders to make general business loans to eligible recipients, permitting the businesses to cover payroll and other expenses.  *See* § 1102(a)(2), (b)(1).

To implement the Act, the Administrator issued an "Interim Final Rule" on April 2, 2020.[1] ECF 7-2; 13 C.F.R. Part 120. The Interim Final Rule explains that loans issued through PPP are federally guaranteed up to an absolute maximum amount of $10 million per loan. ECF 7-2 at 8. Furthermore, the CARES Act provides for forgiveness of up to the full principal amount on qualifying loans. *Id.* at 3; *see also* CARES Act § 1106.

The CARES Act says that lenders "shall consider" whether the borrower (1) "was in operation on February 15, 2020," and (2) either "had employees for whom the borrower paid salaries and payroll taxes," or "paid independent contractors." *Id.* § 1102(a)(2). Accordingly, the PPP lender application form lists two multi-part eligibility requirements for PPP borrowers:

> The Applicant has certified to the lender that (1) it was in operation on February 15, 2020 and had employees for whom the Applicant paid salaries and payroll taxes or paid independent contractors, as reported on Forms(s) 1099-MISC, (2) current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant, (3) the funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, and (4) the Applicant has not received another Paycheck Protection Program loan.

> The Applicant has certified to the Lender that it (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 employees [sic] or, if applicable, meets the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.

ECF 7-3 (alterations in formatting).

The Interim Final Rule lists a number of reasons why an applicant may be deemed "ineligible" for a PPP loan. ECF 7-2 at 7–8. Neither the CARES Act nor the Interim Final Rule imposes prohibitions on what lenders may do in their processes for accepting or processing

---

[1] The Interim Final Rule was immediately effective, because there was "good cause" to dispense with the 30-day delayed effective date provided in the Administrative Procedure Act. ECF 7-2 at 3. However, the Administrator is still accepting comments from interested members of the public. *Id.* at 4 ("The SBA will consider these comments and the need for making any revisions as a result of these comments.").

applications.  Nonetheless, Plaintiffs contend that BofA's eligibility requirements are inconsistent with the plain language of § 1102(a)(2) and with the Interim Final Rule.  ECF 7-1 at 3.

### 2. Implied Private Right of Action

Before the Court can evaluate Plaintiffs' substantive contention, Plaintiffs face a threshold obstacle: the CARES Act does not expressly provide a private right of action.  Accordingly, Plaintiffs must demonstrate that Congress intended for the statute to have an *implied* private right of action.

Inferring a private right of action is a matter of statutory interpretation.  *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 694–95 (4th Cir. 2019).  "If Congress is silent or ambiguous, courts may not find a cause of action 'no matter how desirable that might be as a policy matter.'"  *Id.* at 695 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001)).  Historically, courts evaluated four factors that the Supreme Court elucidated in 1975:

> First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted… Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law?

*Cort v. Ash*, 422 U.S. 66, 78 (1975) (citations omitted).[2]

In subsequent cases, however, "the inquiry has centered more on Congress's intent to create a federal cause of action."  *In re Miller*, 124 F. App'x 152, 154 (4th Cir. 2005).  Specifically, in *Sandoval*, the Supreme Court made clear that a private right of action "must be created by

---

[2] During oral argument, BofA posited that the *Cort* decision is no longer good law.  Hrg. Tr. at 67:11–25; s*ee also Precision Contracting Solutions, LP v. ANGI Homeservices, Inc.*, 415 F. Supp. 3d 113, 120 n. 12 (D.D.C. 2019) ("The Supreme Court and the D.C. Circuit, however, have stepped away from *Cort*'s multi-factor approach toward a focus on statutory intent alone."); *But see, e.g.*, *McGreevey v. PHH Mort. Corp.*, 897 F.3d 1037, 1043–44 (9th Cir. 2018) ("While the *Cort* factors remain relevant, the focus now is on whether Congress 'displays [through the statute] an intent to create not just a private right but also a private remedy.").  The Court need not address this issue, however, because whether the Court applies the *Cort* factors, or follows only the framework of analysis applied in *Sandoval*, Plaintiffs fail to demonstrate that the CARES Act provides a private right of action.

Congress" through the language of the statute. 532 U.S. at 286. This determination requires an "intent to create not just a private right but also a private remedy." *Id.*

The Fourth Circuit recently found an individual statutory right, enforceable under 42 U.S.C. § 1983, in *Planned Parenthood*. 941 F.3d at 700–01. That case concerned the Medicaid Act's free choice of provider provision, 42 U.S.C. § 1396a(a)(23), which mandates that state plans "allow Medicaid recipients to obtain care from any provider who is 'qualified to perform the service or services required.'" *Id.* at 692 (quoting § 1396a(a)(23)(A)). A dispute arose after South Carolina terminated its Medicaid provider agreement with Planned Parenthood South Atlantic ("PPSAT"). *Id.* (explaining that PPSAT operated two healthcare centers in South Carolina). PPSAT, and an individual who had previously received care at one of its facilities, sued the Director of South Carolina's Department of Health and Human Services in his official capacity. *Id.* at 693 (suing on behalf of a purported class of Medicaid beneficiaries who received, or would like to receive, healthcare services at PPSAT). After the district court granted a preliminary injunction to the plaintiffs, South Carolina appealed. *Id.* at 694.

On appeal, the Court first considered the threshold question of whether the free choice of provider provision "creates a private right enforceable under § 1983." *Id.* at 696. The Court applied the three-part framework from *Blessing v. Freestone*, 520 U.S. 329 (1997), and found, in accord with five other circuit courts, that this provision confers a private right that is enforceable under § 1983. *Id.* at 696–98. As Plaintiffs here correctly point out, the panel concluded that "Congress's use of the phrase 'any individual' is a prime example of the kinds of 'rights-creating' language required to confer a personal right on a discrete class of persons—here, Medicaid beneficiaries." *Id.* at 697; *see also* ECF 7-1 at 12. Even so, "a plaintiff suing under an implied right of action still must show that the statute manifests 'an intent to create not just a private right

8

but also a private *remedy.*'" *Qwest Comms. Corp. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 2010 WL 1980153, at \*5 (D. Md. May 13, 2010) (emphasis added) (quoting *Sandoval*, 532 U.S. at 286); *see also Clear Sky Car Wash LLC v. City of Chesapeake, Va.*, 743 F.3d 438, 444 (4th Cir. 2014) (same). And, in the context of the free choice of provider provision, the Fourth Circuit found that Congress intended for § 1983 "to be the remedy for patients seeking to enforce their rights" under the statute. *Planned Parenthood*, 941 F.3d at 699. Here, by contrast, Plaintiffs concede that § 1983 provides them no remedy. *See* Hrg. Tr. at 41:21–42:2. They have not leveraged § 1983 for their suit, since BofA is a private entity, not a state actor.

The other cases cited in Plaintiffs' brief, similarly, involve the unique context of § 1983, in which courts employed that statute as the vehicle to obtain a remedy for the violation of a private right created by federal statute. *See Daniels v. Hous. Auth. of Prince George's Cty.*, 940 F. Supp. 2d 248, 259 (D. Md. 2013) ("Daniels has a federal right to a properly calculated housing subsidy under 42 U.S.C. § 1437f(y), and her causes of action are properly brought pursuant to § 1983."); *Hensley v. Koller*, 722 F.3d 177, 181–83 (4th Cir. 2013) (applying *Blessing v. Freestone* to find a privately enforceable right in the Child Welfare Act under § 1983); *Rabin v. Wilson-Coker*, 362 F.3d 190, 202 (2d Cir. 2004) ("Because all of the language of Section 1396r–6 except the 'plan requirements' language, reflects Congress's intention to confer a right to TMA upon persons who meet the various eligibility requirements, we find that Section 1396r–6 can support a Section 1983 claim."); *Price v. City of Stockton*, 390 F.3d 1105, 1109–15 (9th Cir. 2004) ("[W]e conclude that Plaintiffs have a cause of action under Section 1983.").[3] None of these courts suggested that the

---

[3] The Court does not suggest that § 1983 cases are completely inapposite, because of the inquiry's focus on congressional intent. As explained in *Koller*, for example, "[U]nless Congress speak[s] with a clear voice, and manifests an unambiguous intent to create individually enforceable rights, federal funding provisions provide no basis for private enforcement by § 1983." 722 F.3d at 181. However, the § 1983 cases only have to address the first half of the equation: whether Congress intended to create a privately enforceable right, without, as necessary here, considering also whether Congress intended to create a remedy for private citizens.

statutes at issue contained an implied private right of action — independent of Section 1983 — that could be enforced against private actors. In fact, in *City of Stockton*, the Ninth Circuit's opinion contemplated that finding an independent private right of action is distinct from finding a private right of action that is enforceable via Section 1983. *See* 390 F.3d at 1109 ("The City contends, based on the four-part test announced in *Cort v. Ash…* that no private right of action may be implied from [the statute]. Plaintiffs correctly point out, however, that the provisions of Section 104(d) may create rights enforceable under 42 U.S.C. § 1983").

Perhaps observing these weaknesses in their position, Plaintiffs referenced several cases at oral argument that had not been cited in their brief. For example, *Ray Charles Foundation v. Robinson*, 795 F.3d 1109 (9th Cir. 2015), concerned provisions of the Copyright Act of 1976. In that case, legendary musician Ray Charles, before his death, had entered into contracts with his children, whereby Charles established an irrevocable trust in their names, in exchange for the children waiving claims to his estate. *Id.* at 1112. Sections 203 and 304 of the Copyright Act govern termination of copyright grants. *Id.* Leveraging these provisions, the children filed notices to terminate the grants that had been previously authorized by Charles. *Id.* at 1113. A nonprofit corporation, The Ray Charles Foundation, sued in district court to challenge the validity of the termination notices. *Id.* at 1114. On appeal, as relevant here, the Ninth Circuit concluded that the termination provisions in the Copyright Act contain an implied private cause of action. *Id.* at 1122. The panel reached this conclusion because a regulation explicitly stated that the termination provisions could be enforced by private action. *See id.* (citing 37 C.F.R. § 201.10(f)(6), which stated, "Recordation… is without prejudice to any party claiming that the legal and formal requirements for issuing a valid notice have not been met, including before a court of competent jurisdiction."). Thus, the Ninth Circuit concurred with at least four other courts that had

"entertained suits challenging termination validity under these statutory provisions." *Id.* Here, by contrast, Plaintiffs cannot identify a comparable regulation that would fill the void in the CARES Act's language, nor can Plaintiffs claim that other courts have inferred a private right of action from the days-old statute.[4] In fact, as explained below, relevant case law undermines Plaintiffs' contentions.

As noted above, Title I of the CARES Act (the provision containing the PPP) amended the SBA. Although no court has had occasion to address whether the CARES Act includes an implied private right of action, courts have previously found that the SBA does not contain an implied right of action. For example, in *Crandal v. Ball, Ball and Brosamer, Inc.*, 99 F.3d 907 (9th Cir. 1996), the United States Bureau of Reclamation had hired the lead defendant to repair an aqueduct. *Id.* at 908. Several contracting and subcontracting arrangements were made and, ultimately, disputes arose about how much money should have been paid for the job. *Id.* At issue before the Ninth Circuit was whether the plaintiffs could assert a cause of action via the SBA. *Id.* In analyzing congressional intent, the Court applied the *Cort* factors, and found that most of them cut against finding an implied private right of action. Accordingly, the Court concluded that a cause of action did not arise under the SBA. *Id; see also Bulluck v. Newtek Small Bus. Fin., Inc.*, No. 19-10238, 2020 WL 1490702, at *3 (11th Cir. Mar. 27, 2020) (per curiam) ("[N]o private right of action exists for a violation of the Small Business Act").[5]

---

[4] Additionally, counsel for Plaintiffs identified *Landegger v. Cohen*, 5 F. Supp. 3d 1278 (D. Colo. 2013). Aside from having no binding effect on this Court, that Court, in finding a private right of action in a section of the Exchange Act, made several observations that are readily distinguishable here. For instance, the Court found it compelling that prior to the relevant amendments to the Exchange Act, a private right of action had been recognized by several courts. *Id.* at 1291 ("In light of the referenced pre-1975 cases law … the Court agrees with Plaintiff's preferred construction.").

[5] These cases were limited to specific provisions within the SBA. But this Court is aware of no court that has reached a different result with respect to any portion of that statute. Plaintiffs also conceded at oral argument that they are aware of no case in which a court has found an implied private right of action to exist in the SBA. Hrg. Tr. at 48:6–10.

According to Plaintiffs, the primary indicators of congressional intent to have a private right of action in the CARES Act are: (1) Congress's use of the phrase "any business concern" in § 1102(a)(1), and (2) Congress's directive that regulations issued by the Secretary of the Treasury "shall" contain "terms and conditions that, to the maximum extent practicable, are consistent with" the borrower eligibility criteria, § 1109(d)(2)(B)(i).  *See* ECF 7-1 at 12.  However, the term "any qualified small business concern" was codified in the SBA before Congress amended it with the CARES Act, and thus, this language was operative when courts found that the SBA did not contain an implied private right of action.  Indeed, the view that Congress did not intend to create a separate private right of action in the CARES Act is further bolstered by the criminal and civil enforcement regime codified in the SBA.  Pursuant to 15 U.S.C. § 650(c), for example, the Administrator has authority to institute a civil action against lending companies for violations of the SBA.  *See Sandoval*, 532 U.S. at 289–90 (explaining that a separate enforcement regime "tend[s] to contradict a congressional intent to create privately enforceable rights").  Plaintiffs agreed that lenders could be held accountable by way of the enforcement mechanisms codified in the SBA, but hypothesized that it would be "a year or two or three later."  Hrg. Tr. at 89:23–90:13.  However, Plaintiffs provide no reason, in terms of the statutory language, why the Administrator could not move more quickly, and even seek expedited injunctive relief similar to that sought by Plaintiffs here, if it became aware of misconduct by lenders implementing the PPP.  At the very least, the existence of a robust criminal and civil enforcement regime undermines any contention that authorized lenders have free reign to exploit the CARES Act for their own purposes.

The Court is not persuaded that the language of the CARES Act evidences the requisite congressional intent to create a private right of action.  Indeed, "an expansive approach to implied rights of action 'cannot be squared with the doctrine of the separation of powers.'"  *Planned*

*Parenthood*, 941 F.3d at 695 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 742 (1979) (Powell, J., dissenting)); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 751 (2020) (Thomas, J., concurring) ("After a series of decisions limiting courts' discretion to create statutory causes of action, we renounced the Court's freewheeling approach in [*Sandoval*]").  Even assuming that the CARES Act grants PPP loan applicants with some statutory right to apply through a particular lender of choice (which is, itself, dubious), nothing in its text evidences Congress's intent to enable PPP loan applicants to bring civil suits against PPP lenders, to enforce that right.  The plain language of the statute does not suggest an intent to confer the particular right alleged, nor a private remedy against participating SBA lenders.  To the extent Congress intends to create such a private right of action, it will be able to make its intent clear, if it ultimately amends the CARES Act, as is widely anticipated.  Creation of that remedy, however, is not within the purview of this Court.[6]

### 3.  Consistency with the CARES Act

Even assuming *arguendo* that Congress had intended to provide PPP applicants with a private right of action, BofA's challenged conduct here does not run afoul of the CARES Act.  Plaintiffs argue that BofA is "applying unlawful ineligibility criteria that are contrary to the express eligibility provisions in [sic] the CARES Act."  ECF 7-1 at 8.  However, the express language of the CARES Act dictates a different conclusion.  Congress provided that lenders "shall consider whether the borrower . . . was in operation on February 15, 2020," and  "had employees for whom the borrower paid salaries and payroll taxes" (or independent contractors).  § 1102(a)(2).  The statutory language does not constrain banks such that they are prohibited from considering other information when deciding from whom to accept applications, or in what order to process

---

[6] In Count IV of the Amended Complaint, Plaintiffs seek a declaratory judgment and preliminary and permanent injunction.  ECF 5 at 24.  The Declaratory Judgment Act "provides a remedy in cases otherwise in the Court's jurisdiction; it does not create an independent cause of action."  *Elec. Motor and Contracting Co., Inc. v. Travelers Indemnity Co. of Am.*, 235 F. Supp. 3d 781, 793 (E.D. Va. 2017).

applications it accepts. Indeed, in a previously introduced version of the bill, the relevant section stated, "a lender shall *only* consider" the date in which the business was operational and whether it had employees "for whom the borrower paid salaries and payroll taxes." CARES Act, S. 3548, 116th Cong., § 1102(d)(2)(B) (emphasis added); ECF 15-2 at 190 (emphasis added). This particularly relevant legislative history bolsters the already-plain meaning of the CARES Act's existing text. The fact that Congress considered including the word "only" in a previous version of the law that failed to win approval in a Senate committee, suggests, at the very least, that the Court should not read that word back into the statute that both houses of Congress enacted. *Cf. Unsecured Creditors' Comm. 82-00261c-11A v. Walter E. Heller & Co.*, 768 F.2d 580, 585 (4th Cir. 1985) (considering that Congress explicitly rejected certain language in a bankruptcy-related bill).

In support of their argument that BofA has contravened the CARES Act, Plaintiffs refer to the fact that Congress waived the "credit elsewhere" requirement, codified in the SBA, with respect to PPP loans. ECF 7-1 at 7–9 ("BofA is applying an unlawful 'credit elsewhere' requirement that was expressly prohibited by the CARES Act."); *see also* CARES Act § 1102(a)(1). However, the credit elsewhere requirement and BofA's eligibility criteria serve entirely different purposes. Typically, when an entity applies for an SBA loan, it has to certify that it could not obtain a loan from a different source. *See* 13 C.F.R. § 120.101. In this case, BofA has imposed no such requirement on businesses' eligibility for the PPP. Based on the limited record before this Court, more than 2,400 institutions have participated in the PPP, and at least ten of those lenders accept new customers with no prior banking relationship. *See* Hrg. Tr. at 57:15–24 (stating "In some of the materials we submitted, we catalogued the standards of the various banks that we had been able to discern through Internet searches and the like"). BofA does not require that prospective

PPP applicants exhaust all available lending options. Instead, BofA says that if a business has an *existing* relationship with another credit source, then it should process a PPP loan through that entity. Therefore, Congress's decision to waive the "credit elsewhere" requirement does not establish unlawful behavior on the part of BofA.

Given the plain statutory language, the Court is not at liberty to impose further limitations on lenders. *See Moore v. Frazier*, 941 F.3d 717, 726–27 (4th Cir. 2019) ("In matters of statutory interpretation, 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms . . . .'") (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)). Indeed, numerous other financial institutions have imposed additional eligibility requirements, beyond the two identified in the CARES Act. For example, survey data suggests that some banks have focused on processing loans for, *inter alia*: regional clients, veteran-owned businesses, rural markets, and economically disadvantaged owners. ECF 15-2 at 462–79.[7] In fact, several other lenders, including Chase Bank, similarly require that borrowers have an existing relationship with their bank. ECF 15-2 at 459 ("You'll need to meet this criteria: You have an existing Chase Business checking account that's been active since February 15, 2020."). Accordingly, even if the Court were to infer a private right of action in the CARES Act, Plaintiffs

---

[7] Plaintiffs suggested at oral argument that these considerations are permissible under the statute because of the "Sense of the Senate" provision. Hrg. Tr. at 31:1–18. However, "Sense of" provisions do not have the force of law. *See Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Service*, 630 F.3d 431, 441 n. 16 (5th Cir. 2011) ("[A]lthough a sense of Congress provision can, in some instances, provide valuable assistance in interpreting earlier legislation, such provisions are of limited legal effect."). Thus, the "Sense of the Senate" provision does not provide a valid way to distinguish the criterion set by these banks from that of BofA. Accepting Plaintiffs' argument that institutions are limited to the considerations expressly listed in the CARES Act would foreclose institutions from preferencing veterans, minorities, and women, in addition to their own depository or borrowing customers.

have not demonstrated that BofA's eligibility criteria are inconsistent with the plain language of the statute.[8]

## B. Irreparable Harm

In light of this Court's evaluation of the private right of action and the CARES Act's statutory language, Plaintiffs are unable to establish a likelihood of success on the merits. That assessment alone prevents entry of a TRO, as well as a preliminary injunction. In any event, Plaintiffs' request for a TRO is further barred by consideration of the remaining preliminary injunction factors.[9]

Generally, "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Coreas v. Bounds*, 2020 WL 1663133, at *13 (D. Md. Apr. 3, 2020) (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 551 F.3d 546, 551 (4th Cir. 1994)). Moreover, issuing a TRO "based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).

---

[8] Plaintiffs appeared not to press their unjust enrichment claim in the Motion for a Temporary Restraining Order. Nonetheless, given the Court's analysis, Plaintiffs have not shown that BofA accepted or retained a benefit under circumstances that would make it inequitable. *See Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295 (2007).

[9] Plaintiffs objected to this Court's consideration of fact-based representations made by BofA at oral argument. However, the Fourth Circuit has noted that, "[b]ecause preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1239 (2017). Nonetheless, this Court is cognizant of how fluid and unpredictable the COVID-19 epidemic remains. Thus, out of abundance of caution, the Court's analysis on irreparable harm, balance of the equities, and the public interest is limited to consideration of the documentary evidence submitted in the parties' briefing on Plaintiffs' Motion for a Temporary Restraining Order, rather than also encompassing a potential future Motion for a Preliminary Injunction. Unlike the analysis governing Plaintiffs' likelihood of success on the merits, which is guided exclusively by interpretation of the law, new facts could change the Court's analysis of the remaining injunctive relief factors. As a practical matter, though, the lack of a private right of action may prove fatal to Plaintiffs' case in its entirety, absent express congressional action.

In their motion, Plaintiffs contend that, "[a]bsent a temporary restraining order and preliminary injunction, the 'first-come-first-served' PPP loans will not be available at the time of trial and thus any recovery for wrongs committed by BofA will be insufficient to save Plaintiffs." ECF 7-1 at 16. Certainly, BofA does not dispute that the loans are distributed on a first-come, first-served basis. Even so, the record is not clear at this time as to how many of the Plaintiffs applied for — or could have applied for — loans with other financial institutions. Moreover, for those Plaintiffs that have applied to other institutions, there is no evidence as to whether Plaintiffs were denied because of the presence of, or lack of, a preexisting lending relationship. In *Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017), SPX had agreed to provide lifetime healthcare coverage to identified retirees and their family members through group insurance plans. *Id.* at 227. However, SPX subsequently changed the arrangement such that it would provide a healthcare reimbursement account ("HRA") to beneficiaries, who would, in turn, purchase their own healthcare plan from an insurance exchange. *Id.* at 228. The plaintiffs filed a class action, alleging that the HRAs were not substantially equivalent to their original healthcare benefits. *Id.* The district court denied the plaintiffs' request for a preliminary injunction and, on appeal, the Fourth Circuit affirmed. *Id.* at 227.

Importantly, in evaluating the irreparable harm prong, the Fourth Circuit emphasized that the plaintiffs' harm was, to a certain extent, self-imposed. Specifically, the plaintiffs alleged that their irreparable harm was "suffer[ing] uncertainty and stress caused by a lack of insurance" and "hav[ing] to forego other necessities to afford medical care." *Id.* at 235. However, a significant number of the eligible beneficiaries had failed to purchase insurance with their HRA funds, as provided by SPX. *Id.* Thus, the panel found that each retiree "had the option to avoid the loss of insurance by securing coverage through an HRA account." *Id.* Similarly, here, not all of the

Plaintiffs have indicated whether or not they attempted to apply for PPP loans with a different lender. The Court does not doubt the sincerity of Plaintiffs' representations about the pernicious impact COVID-19 has had on their businesses. But, assuming *arguendo* that BofA's restrictions would prohibit Plaintiffs from obtaining a loan through BofA, BofA's rules did not prevent Plaintiffs from applying elsewhere. In fact, BofA contends that it instituted its policy to improve the efficiency of the overall PPP system. Just as the retirees in *Di Biase* "presented no evidence that anyone who had attempted to secure insurance using an HRA account was unable to do so," 872 F.3d at 235, Plaintiffs have not shown that any small business in the putative class was entirely foreclosed from applying for a PPP loan. Since the evidence on the current record shows that there are thousands of institutions participating in PPP, and several that accept loans from new customers, BofA, by definition, has not denied Plaintiffs access to the PPP. Indeed, Plaintiff Profiles has an outstanding PPP loan application with another lender that is currently being processed. Hrg. Tr. at 26:21–27:6 (stating Profiles "had identified another lending institution that will help it, but its application has still not been assigned a number.").

Plaintiffs allege that they have suffered irreparable harm through (1) the deleterious effect on their small businesses, and (2) the lack of access to BofA's application portal. But Plaintiffs have not shown that this irreparable harm is "actual" and "imminent." *Direx Israel, Ltd. v. Breakthrough Medical Corp.* concerned trade secrets related to a medical device for dissolving kidney and gall stones. 952 F.2d 802, 804 (4th Cir. 1991). In that case, the incorporator of Direx obtained funding from the Israeli government to work on his "lithotripter." *Id.* at 805. Subsequently, he hired a mechanical engineering graduate to assist with research ("Spector"). *Id.* While Direx attempted to market its device in the United States, a rival company had been chartered in Delaware. *See id.* at 807. Partially due to a deteriorating relationship between Spector

and the founder of Direx, Spector joined the rival company, and assisted in the development of a similar medical device. *Id.* Direx, soon thereafter, filed suit in United States District Court, seeking to enjoin Spector from sharing Direx's trade secrets with the rival company. *Id.* at 808. Although the district court granted a limited preliminary injunction, the Fourth Circuit reversed on appeal.

Pertinent here, the Fourth Circuit found that the alleged irreparable harm was uncertain. *Id.* at 816. Namely, the rival company had not yet secured approval from the FDA to market its product in the United States. *Id.* at 815. Accordingly, there was "no present or reasonably anticipated threat that [the other company would] be able to market its product" against Direx. *Id.* at 815. Here, similarly, there is not enough information, on the current record, to suggest that Plaintiffs will be unable to apply for, or to secure, a PPP loan from any PPP lender. As described above, hundreds of thousands of businesses, including one or more of the Plaintiffs, have applied for the PPP at thousands of participating lenders. Notably, not all of the Plaintiffs have even illustrated that they will be unable to secure a PPP loan *with BofA*. For example, Plaintiff Elite's owner submitted an application with BofA that is currently being processed. *See* Hrg. Tr. at 27:11–25. While Plaintiffs' counsel suggested that the loan may not be approved, counsel also conceded that one of the originally named plaintiffs, "Jerky Coast to Coast, LLC," was removed from this litigation because it successfully processed a PPP loan with BofA. Hrg. Tr. at 76:4–11 (explaining that BofA apparently made "an exception" for this business).

Furthermore, Plaintiffs' argument for irreparable harm is speculative in another regard. Although Plaintiffs have not yet demonstrated that they cannot obtain a PPP loan, it is perhaps more speculative to assert that court-ordered injunctive relief would remedy any harm to Plaintiffs' businesses. At the hearing, neither side could confidently answer the Court's questions about what

percentage of loans are approved and, perhaps more importantly, how often the disbursed loan amount is less than what was requested. To grant relief, the Court must assume not only that Plaintiffs would get approved for a PPP loan, but also that the loan amount would serve as a panacea for the lost revenue in their respective businesses. Given the unpredictability of COVID-19, and the uncertain duration of governmental orders shutting down non-essential businesses, it would be quite extreme to attribute the dire plight facing American small businesses to one lender's eligibility criteria. At this stage of the proceedings, Plaintiffs have not made the clear showing that preliminary injunctive relief would remedy their alleged injury, if it is defined as financial harm to their businesses. *See Marietta Memorial Hosp. v. W.V. Health Care Authority*, No. 2:16-cv-08603, 2016 WL 7363052, at *8 (S.D. W. Va. Dec. 19, 2016) ("If the requested relief does not alleviate the alleged injuries, then refusal to grant that relief could not cause irreparable harm."). For all of these reasons, Plaintiffs have not established that they will suffer irreparable harm if a temporary restraining order is not entered.

## C. Balance of the Equities and Public Interest

Finally, even if Plaintiffs had demonstrated each of the factors above, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). Plaintiffs have not met their burden to establish the remaining preliminary injunction factors, which courts often consider together. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017), *as amended* (June 15, 2017), *vacated and remanded on other grounds sub nom.*, *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) ("As the district court did, we consider the balance of the equities and the public interest factors together.").

As noted above, the Court is certainly sympathetic to the economic harm that Plaintiffs' respective small businesses are enduring. COVID-19 has wreaked havoc on this country, and the global economy, which motivated Congress to enact the CARES Act. BofA's rigid eligibility criteria have undoubtedly made it materially harder for some small businesses to access the PPP. For example, Yasmine Young is the founder and owner of Plaintiff Diaspora, located on North Charles Street in Baltimore, Maryland. *See* ECF 5 ¶ 19. Because Diaspora has only a depository relationship with BofA, Ms. Young was first blocked from applying for PPP on April 3, 2020. She tried again after BofA's policy change, but was deemed ineligible to apply with BofA, because she had obtained a loan (for moving expenses) from another financial institution. Hrg. Tr. at 12:13–13:9. While BofA advised her to secure a PPP loan with her lender, it is not clear whether that institution is even offering PPP loans. Although BofA contends that at least ten lenders accept applications from entirely new customers, Hrg. Tr. at 57:15–20, the Court does not presume that every small business owner has the level of sophistication necessary to identify and communicate with these other lenders, particularly in this time of great stress and isolation. The competing demands imposed on American small business owners by COVID-19, combined with the "first-come, first-served" nature of the PPP, made it entirely sensible for these Plaintiffs not only to start with the bank where they have an existing business relationship, but also to assume and expect that BofA would accept their applications. Even assuming that Ms. Young, and the other owners, can ultimately secure a loan with another institution, they certainly lost valuable time from their inability to apply at the first institution that they contacted. *See* Hrg. Tr. at 13:19–25.

On the other hand, however, imposing a requirement that banks can only consider the two factors identified in the CARES Act would have consequences reaching far beyond the litigants in this particular case. For instance, given the voluntary nature of PPP, a ruling of the magnitude

requested by Plaintiffs could disincentivize lenders from participating in the program altogether. A review of the record reveals not only that other lenders have developed additional eligibility criteria, but also that other banks prioritize their own existing customers. *See, e.g.*, ECF 15-2 at 467 ("When CenterState is ready to process loans, it will give priority to businesses in under-served and rural markets, veteran-owned businesses, economically disadvantaged owners and businesses that are less than two years old."); *id.* at 468 (stating that East West Bank is "giving existing business checking account customers priority."). This Court is reluctant to impose liability, particularly in the form of a "mandatory" TRO, where doing so may undermine Congress's goal to maximize relief for American small businesses. If fewer lenders are incentivized to participate in PPP, because they are prohibited from prioritizing their own customers or other entities they believe worthy of expedited consideration, then fewer American small businesses will have access to the pool of readily available PPP funds, and Congress's statutory scheme would be further frustrated, despite the fact that the federal government will ultimately guarantee over $300 billion in loans.

Moreover, BofA has made a compelling argument that prioritizing existing borrowers will expedite the processing of loan applications, because "[f]or example, a lender can more easily identify those existing customers who may be ineligible for PPP loans." ECF 15 at 2. BofA and other lenders, such as Chase Bank, have determined that limiting applications to customers with a preexisting client relationship will be more efficient for their system, and potentially for the overall CARES Act scheme. *See* ECF 15-2 at 459 (listing Chase application requirements, including that customers have a checking account with Chase). On the other hand, Plaintiffs point out that several legislators have voiced their dissatisfaction with lenders' decisions to impose additional

eligibility requirements.  *See* ECF 7-1 at 6 (referring to Senator Ben Cardin's press release and to Senator Marco Rubio's Twitter account).

The Court will not wade into the merits of this debate.  Certainly, Plaintiffs' experiences demonstrate a significant flaw, from their perspective and that of many other small businesses, in the implementation of the massive and complex PPP program.  However, given the competing policy interests, the need to balance the desire to assist the widest swath of small businesses with the need to incentivize lender participation, and the overall fluidity of this epidemic, Congress is better positioned to remedy any defects in the CARES Act, and to pass the supplemental legislation it believes best aimed at ameliorating the effects of the COVID-19 crisis.  Due to the circumstances explained above, and the potentially unknowable effects of a ruling from this Court, Plaintiffs have not met their burden to show that the balance of the equities and consideration of the public interest entitles them to even the temporary injunctive relief sought.

IV. **CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, ECF 7, is denied.  A separate Order follows.


Dated: April 13, 2020                                    /s/
                                                                Stephanie A. Gallagher
                                                                 United States District Judge

23